# UNITED STATES DISTRICT COURT
for the
District of Colorado

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name and address)* )
A Samsung cellular telephone, model SM-G532M, IMEI 352706092899075, serial number R28J93T6J0X, and inserted Kingston 4GB microSD card, in the possession of Andrew Todd Vanderwal at the time of his arrest, held as evidence item 1B1 of FBI case 88F-DN-2133140, and more fully described in Attachment A, attached hereto. )

Case No.   18-sw-05256-MEH

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the __State and__ District of __Colorado__ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

  X  evidence of a crime;

  X  contraband, fruits of crime, or other items illegally possessed;

  X  property designed for use, intended for use, or used in committing a crime;

  ☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __18__ U.S.C. §§ __2251, 2252 and 2252A__, and the application is based on these facts:

  X  Continued on the attached affidavit, which is incorporated by reference.

  ☐  Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/* Philip R. Jones
*Applicant's signature*

Philip Jones, Special Agent, FBI
*Printed name and title*

Sworn to before me and:  ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **06 Mar 2018**

*Judge's signature*

City and state: __Denver, CO__

Michael E. Hegarty, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Philip Jones, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been since January 2015. As part of my duties, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of Title 18, United States Code, Sections 2251, 2252, and 2252A. I have received training and instruction in the field of investigation of child pornography and have had the opportunity to conduct investigations relating to the sexual exploitation of children. As part of my training and experience, I have reviewed images containing child pornography in a variety of formats (such as digital still images and video images) and media (such as digital storage devices, the Internet, and printed images).

2. This affidavit is submitted in support of an application for a search warrant for cellular telephones and related equipment (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2251, 2252, and 2252A.

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2251, 2252, and 2252A are located in the place described in Attachment A.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5. A Samsung cellular telephone, model SM-G532M, IMEI 352706092899075, serial number R28J93T6J0X, and inserted Kingston 4GB microSD card, located on the person of Andrew Todd Vanderwal at the time of his arrest in Cuauhtémoc, Chihuahua, Mexico. The items include the following items listed below, referred to hereinafter and in Attachments A and B as the "Devices:"

    A. A Samsung cellular telephone, model SM-G532M, IMEI 352706092899075, serial number R28J93T6J0X. This phone is made in China and bears Spanish words on the manufacturer's label demonstrating that the device was likely purchased in Mexico. It has been powered off.

    B. A Kingston 4GB microSD card inserted in the Samsung device.

6. I believe there is probable cause to believe that the Devices are or contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2251, 2252, and 2252A. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

7. The Devices are currently in the lawful possession of the FBI. They came into the FBI's possession in the following way: They were seized from Vanderwal's person at the time of his arrest on February 19, 2018 in Cuauhtémoc, Chihuahua, Mexico. Arresting authorities in Mexico, to include Mexican law enforcement and FBI special agents assigned to Legal Attaché Mexico City, transported Vanderwal to El Paso, Texas, where personal property was handed to SA Curtis South, FBI – El Paso. SA South then shipped a box of Vanderwal's property, including the cellular device with inserted MicroSD card, to my office via FedEx tracking number 7715 3780 4732, which I received February 22, 2018 at approximately 11:30 AM. The devices are stored as a single evidence item, 1B1, associated with FBI case 88F-DN-2133140.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

8. Based on my training and experience, I know about the following items, hereinafter and below and in the Attachments "Devices."

9. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones, such as Vanderwal's device, may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. In this instance, Vanderwal's device had such a removable storage device inserted capable of storing up to 4 gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

10. Based on my knowledge, training, and experience, I know that cellular telephones and digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

11. Based on my knowledge, training, and experience, examining data stored on computers, cellular telephones and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

12. There is probable cause to believe that things that were once stored on the Devices may still be stored there, for at least the following reasons:

    A. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    B. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    C. Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer and cellular telephone users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    D. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

13. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Devices that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of the use, who used the Devices, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    A. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the

3

computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C. A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D. The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F. I know that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain items to include, but are not limited to, internet search terms indicative of a user's intent to access child pornography, indications of downloading child pornography, the movement of images and videos depicting child pornography from one storage medium to another and electronic communications between individuals sharing an interest in the sexual exploitation of children.

G. I also know that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

H. A single compact disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers and cellular telephones has grown tremendously within the last several years. Thumb drives with a capacity of 128 gigabytes are not uncommon. Flash cards with a capacity of 128 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. These drives can store thousands of images and videos at very high resolution. Magnetic storage

      located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

14. *Need to review evidence over time and to maintain entirety of evidence*. I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

15. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Devices consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the Devices or information from a copy of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

16. I became aware of Andrew Todd Vanderwal, age 27, in February of 2017 after he fled the United States of America after being released on bond. He had been arrested for sex assault on a six-year-old child, hereinafter Minor 1[1].

17. Fort Collins Police Services (FCPS) interviewed Vanderwal, and Vanderwal confessed to sexually assaulting Minor 1. Vanderwal was arrested on November 1, 2016, and the Larimer County District Attorney's office accepted the first felony charges of Sex Assault on a Minor on November 4, 2016. Vanderwal posted his $7,500 bond, and he failed to appear in court on January 19, 2017. An arrest warrant for felony failure to appear was issued on that date.

18. After Vanderwal's flight, the Larimer County District Attorney's office filed additional charges of Sex Assault on a Minor against Vanderwal when a second victim was identified. Minor 2, age five to six at the time of the sex assaults, was identified after the child's parents contacted law enforcement following a press release for Vanderwal's arrest.

19. Minors 1 and 2 have been forensically interviewed, and they described the sexual assaults. I am aware of additional potential juvenile victims in Colorado and the State of Michigan; however, Vanderwal is only currently charged with sex assault on Minors 1 and 2.

20. Vanderwal was described as a youth hockey coach, and he utilized his position of trust to access and rape young children in their homes. Following Vanderwal's flight, a box containing youth sports equipment and children's clothing was located in his former room. The box was described to be a form of a "trophy" collection of items obtained from past victims.

21. On February 14, 2017, the Honorable United States Magistrate Judge Nina Wang authorized an arrest warrant for Vanderwal based on a criminal complaint for Unlawful Flight to Avoid Prosecution.

22. On January 4, 2018, I received information regarding Vanderwal's whereabouts from Minor 1's mother, Lydia Lerma, hereinafter Lerma, which ultimately led to Vanderwal's arrest in Cuauhtémoc, Chihuahua, Mexico on February 19, 2018. Vanderwal was deported to the United States, and he is currently in transit to Larimer County in Colorado, where he will appear for the aforementioned charges of sex assault on Minors 1 and 2.

23. During the process of locating, positively identifying and apprehending Vanderwal, I received photographs of Vanderwal in Cuauhtémoc. One photograph depicts Vanderwal standing near a Ford Expedition attributed to him. In a separate photograph, Vanderwal is no longer visible, but two Hispanic teenage males, exact age unknown, were observed seated on the rear of Vanderwal's Expedition. I am aware that Vanderwal was frequently seen accompanied by children in Mexico, and a WhatsApp profile photograph for a phone number attributed to Vanderwal depicted him standing with a group of 19 Hispanic, male youths. He appeared to be the coach of a youth sports

---

[1] The actual identities of minors referenced in this affidavit are known to the FBI; however, their names are withheld due to their juvenile status.

team in this WhatsApp photograph. I cannot determine if the males observed seated on the rear of Vanderwal's Expedition are the same males depicted in the WhatsApp photograph.

24. On February 28, 2018, I became aware of additional information provided by Vanderwal's former landlord[2], hereinafter "Landlord," via Lerma.

25. While in Cuauhtémoc, Chihuahua, Mexico, Vanderwal lived in an apartment managed by Landlord, and Vanderwal reportedly owed Landlord several thousand pesos for outstanding rent and utility payments.

26. On or about February 28, 2018, Landlord entered Vanderwal's residence where Landlord located a laptop, documents, identification cards, a suitcase of what is described to contain children's clothing and what were described as reports of missing children. Vanderwal had used the alias Charlie Harper Penner, but Landlord found documents with Vanderwal's true name. Landlord conducted online research and located information about Vanderwal posted by Lerma to social media platforms, such as Facebook, and Landlord reached out to Lerma via Facebook Messenger.

27. Landlord utilized a camera to take photographs of images located on Vanderwal's computer, which Landlord reported to be unlocked and powered on, and Landlord sent images to Lerma, who in turn sent an image to Your Affiant. I noted that the photograph may potentially contain child pornography, and I recommended that Lerma discontinue sending such photographs and ensure their prompt deletion. I asked if Lerma could request written descriptions of the images from Landlord instead of transmitting the photographs electronically.

28. Upon further reflection about the preservation of evidence, I reached out to Lerma on March 5, 2018 in order to possibly forensically preserve the photographs Lerma received from Landlord. I have maintained the photograph I received, and I am arranging to have the photograph extracted in order to be properly preserved.

29. Lerma provided a number of screenshots depicting communications between Lerma and Landlord. It should be noted that Landlord does not speak English, and Lerma's Spanish is limited. It appears that Landlord used Google Translate or a similar program to type messages to Lerma. Lerma did not send the entire conversation to me, and I have only included segments of the conversation below to demonstrate probable cause that Vanderwal's laptop computer contained child pornography.

[Note: The exact date and times of the below conversations are unknown due to the format of the conversation I received, but I believe the following messages were transmitted on February 28, 2018.]

30. [missing conversation segment]

31. Landlord: I think that's what they do When they sell and abuse children

32. Landlord: [three emojis – crying]

33. Landlord: give me a number to keep in touch with you

---

[2] Landlord's name is known to the FBI; however, it is withheld from this document for safety concerns due to Landlord's location in Mexico.

34. Lerma: [provides her cellular number]

35. Landlord: [sends a photograph of a montage of twenty images, described in further detail below]

36. Landlord: I leave his laptop on. I'm afraid to see what else is inside. He has too much child pornography

37. Landlord: --and is it possible to send the computer from here to eua [sic]? Or do I need to take the step to take it? I found the passport. Two licenses, a bank card, and many reports of missing persons' disappearances

38. [missing conversation segment]

39. Lerma: Can you send me a written description of what you saw on the computer.

40. Landlord: I do not know if I have a password. The laptop was open and on. I did not want to touch anything

41. Landlord: It has many folders with pictures of naked children. Child pornography and photos of the same with children.

42. Landlord: apparently he was browsing the deep web

43. Landlord: --sorry, a question Are you going to take charge only of the medium of the computer or also of the debts that you have with me? I need to pay the receipts and that … only the light owes me 11,000 pesos

44. Lerma: Getting the computer to the FBI will help capture the pedophiles

45. Landlord: Yes but the Mexican police is corrupt. We do not know who to trust. The criminals are the same police. I am very afraid.

46. Landlord: I would like to help you stop all those involved but my fear is that they will do something bad to me because if they know that I send the tests [note: this word is used multiple times indicating a possible misinterpretation by the translation program Landlord is using], it will go wrong for all of us

47. Landlord: [sends photograph of two suitcases and what appears to be a laptop case contained in a closet]

48. Landlord: These suitcases are the ones that I would send. With all the clothes of the children. Papers. Passport cards and laptop

49. Landlord: Could you get an interpreter to call you? To agree well on what to do

50. Landlord: a relative of yours We need to solve this matter immediately

51. Landlord: The partners have already communicated with us. They are interested in paying me all the money and entering the house for Andrew's belongings. But if you serve more evidence, I would prefer that you take them with the corresponding authorities.

52. Lerma asked if Landlord could ship the possessions via FedEx, and she offered to go to Mexico to retrieve the items. The court should also be aware that Lerma provided a payment of $100 to Landlord to hold the items located at Vanderwal's apartment. Landlord asked for $1,000 because some of Vanderwal's associates in Mexico were offering money for Vanderwal's computer, and Landlord has also asked if someone could assume Vanderwal's debt.

53. I have been in contact with Legal Attaché Mexico City in order to gain custody of Vanderwal's possessions through established channels, and Legal Attaché Mexico City contacted Landlord to coordinate taking possession of the items. These items are currently in the custody of Mexican authorities, and Legal Attaché Mexico City will ship the items to FBI - Denver once a formal request has been processed.

54. A special agent assigned to Legal Attache Mexico City, who is fluent in Spanish, spoke with Landlord via telephone and confirmed that Landlord did believe she observed child pornography on Vanderwal's computer. Landlord could not provide additional information about ages. Landlord also clarified that Vanderwal's suitcase contained children's underwear. Some of Vanderwal's associates had approached Landlord offering to buy Vanderwal's laptop computer.

### Review of Photographs

55. I reviewed the image received from Landlord via Lerma, which is a montage of a series of black and white photographs. Based on my previous experience with child pornography, the images appear to depict a teenage male, Male A engaging in sexual intercourse with an adult male, Male B.

56. The montage series is arrayed in four rows of five pictures per row. The third photograph in the top row depicts the two males, nude, standing next to each other and visible from upper torso down. Male A appears to be significantly shorter than Male B.

57. The series progresses through images of Male A performing oral sex on Male B, and a couple of photographs appear to depict Male A being anally penetrated by the Male B.

58. The center photograph located on the third row depicts a close up of a portion of Male A's face, and the apparent youthful features of the face are consistent with a juvenile when coupled with Male A's smaller stature observed in other photographs.

59. Based on my experience reviewing such images, Male A appears to be in the "age difficult" range, meaning that he appears to be pubescent, but he is likely under the age of 18. An exact age cannot be determined without examination of additional photographs of the male or positively identifying the male.

### INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN AND POSSESS OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

60. Based on my previous training and experience related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals who possess or access with intent to view child pornography have a sexual interest in children and in images of children. Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

    A. The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

    B. The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children. Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that is used to communicate with others about sexual activity or interest in children. Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant. In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

    C. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. **They almost always maintain their collections in the privacy and security of their homes, cars, garages, sheds, or other secure storage location, such as on their person.**

    D. The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

    E. The majority of individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children, as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

    F. The majority of individuals who collect child pornography often collect, read, copy or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained

      in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

    G. Individuals who would have knowledge about how to access a hidden and embedded bulletin board would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

61. Based on the following, I believe that a user of the cellular device, Andrew Vanderwal, displays characteristics common to individuals who access with the intent to view and/or, possess, collect, receive, or distribute child pornography.

## CONCLUSION

62. Through training and experience conducting investigations of sexual exploitation of children, I am aware that child pornography can easily be transferred from electronic devices, such as computers, to other electronic devices in the subject's possession, such as cellular telephones, and back.

63. These files, such as the montage described above, can be readily transported via removable storage media, such as the micro SD card located on Vanderwal's cellular telephone, or the cellular device can be connected directly to a computer in order to transfer files.

64. Image files such as the montage described above can be electronically transferred and accessed by multiple devices with internet capabilities. Internet users may store images on cloud storage that can be remotely accessed by cellular devices and computers with internet access, or they may use email accounts accessible again by both cellular devices and computers with internet access.

65. I am also aware that many individuals seeking to receive or download images of child pornography often access the dark web, or "deep web" as Landlord references, via The Onion Router.

66. I have noted examples in which the transfer of data from a cellular device to a computer, and not vice versa, exists in instances in which the subject of an investigation has access to minors and has shown a propensity to physically sexually assault these minors. Cellular devices, such as Vanderwal's, have the capability of taking and storing images and videos, which can later be transferred to a computer.

67. Based on the investigation described above, probable cause exists to believe that inside the Devices (described on Attachment A), will be found evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Sections 2251, 2252, and 2252A (described on Attachment B).

68. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

_____s/Philip R Jones_____
Philip R. Jones
Special Agent, FBI

SUBSCRIBED and SWORN before me this __6th__ day of ____March_____ 2018

_Michael E. Hegarty_
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Judith A. Smith, Assistant United States Attorney.

12

## ATTACHMENT A

### **DESCRIPTION OF LOCATION TO BE SEARCHED**

1. I am requesting seizure and examination of the following items, further described as follows, (hereinafter and in Attachment B the "Devices") currently held as evidence item 1B1 of FBI case 88F-DN-2133140 at the FBI's Fort Collins office, 2915 Rocky Mountain Avenue, Suite 210, Loveland, Colorado:

    A. A Samsung cellular telephone, model SM-G532M, IMEI 352706092899075, serial number R28J93T6J0X. This phone is made in China and bears Spanish words on the manufacturer's label demonstrating that the device was likely purchased in Mexico. It has been powered off.

    B. A Kingston 4GB microSD card inserted in the Samsung device.

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

For the Devices listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 18, United States Code, Sections 2251, 2252, and 2252A:

1. Any and all information, video or image files, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of Title 18, United States Code, Sections 2251, 2252, and 2252A:

2. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Devices or by other means for the purpose of committing violations of Title 18, United States Code, Sections 2251, 2252, and 2252A.

3. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of Title 18, United States Code, Sections 2251, 2252, and 2252A.

4. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of Title 18, United States Code, Sections 2251, 2252, and 2252A.

5. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of Title 18, United States Code, Sections 2251, 2252, and 2252A or that show who used, owned, possessed, or controlled the Devices.

6. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Devices, or that aid in the identification of persons involved in violations of Title 18, United States Code, Sections 2251, 2252, and 2252A.

7. Credit card information, bills, and payment records pertaining to violations of Title 18, United States Code, Sections 2251, 2252, and 2252A.

8. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of Title 18, United States Code, Sections 2251, 2252, and 2252A.

9. Evidence of who used, owned, or controlled the Devices to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

10. Evidence of software that may allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security

provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software.

11. Evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence.

12. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices.

13. Evidence of how and when the Devices were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

14. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Devices.

15. Passwords, encryption keys, and other access devices that may be necessary to access the Devices.

16. Contextual information necessary to understand the evidence described in this attachment.

DEFINITIONS:

17. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).